May it please the Court, my name is Stephen Ektish. I represent the Petitioner, Mr. Ermes Macedo. Your Honors, Mr. Macedo has a death sentence hanging over his head. Should he return, be ordered to return to Brazil, there's a substantial likelihood he will be released. I have a question. What do we do with that finding in the record by the IJ that Mr. Macedo lived for four years after this incident in someplace not terribly far away from where the drug lord was? Right. This goes to the issue of internal relocation, Your Honor. I am prepared to address that issue. I would say just very briefly to respond to your question, it's clear from the record that Mr. Macedo returns to Brazil after three years, after he resigned, after the first attack by Oliveira, and he lives he hides out. He's hiding out, living on a small farm out of the city. For 12 to 15 months, that's his testimony. He then moves around surreptitiously from small town to small town in the greater Guayana area. At that point, when he, you know, he essentially tested the water. He got together with a few of his associate friends in Guayana, went into a night that he went into that nightclub for the first, essentially for the first time. He was encountered by none other than Oliveira, who is undisputed, I think, from the record, a drug lord whose influence permeates the region. Wasn't that the immigration judge's point, that when he went back into Guayana, that that's where he reencountered the drug lord, and that there, while he was on the outskirts, and that he also could live elsewhere, further away from Guayana, would make it possible for him to have internal relocation? Right. I think that if you look, Your Honors, at the legal opinion of Mr. Jao Ferreira, it is at Exhibit 18 at page 343, you will find that he did an extensive review of all of the many of the facts and documents in this case, the police incident reports, the medical records, and so on. And he found that at page 387, that Macedo's life would not be protected by moving to another part of Brazil, particularly the administrative record. To the administrative record, yes. And the page number again, I'm sorry. I'm sorry. It's page 387 of the administrative record. Okay. He states there that Macedo's life would not be protected by moving to another part of Brazil, particularly as evidenced by the hunting, fighting, and attacking of Macedo years after the first arrest. Keep in mind that it was in 1999 that Mr. Ferreira was arrested in Bolivar at this nightclub, and it was at that time. And there were witnesses whose testimony appears at the administrative record at 20 ---- You see, this we're all back to the nightclub. I mean, that's as fast as you can. Well, you see, the problem was saying he couldn't go anywhere in this rather large country of Brazil, and this is evidenced by the fact that he was attacked at the nightclub in the very town where this whole thing started. We always keep getting back to the only evidence that he couldn't relocate seems to be related to the nightclub. Well, I would respectfully disagree with that point, Your Honor. And what would be the evidence? And I, you know, I ---- The evidence is ---- What would be the evidence? The evidence is replete, if I may, Your Honor, throughout the ---- particularly not only in Mr. Macedo's testimony and his declaration, but also in the administrative record, Exhibit 3, Exhibit Macedo's testimony, the declaration of Sampia da Silva at page 267, where it's stated at page 267 that Oliveira and his accomplices staked out Macedo for the purpose of ambushing and killing him. You know, it's sort of you're asking me in a way to argue a negative here. I completely respect what you're asking. But keep in mind that Macedo is from this area. This doesn't mean, you know, if Macedo had been in Rio and the attack occurred, then, you know, we wouldn't be asking this question because it would be completely apparent that internal relocation would be impossible or reasonably so. And ---- Whose burden is it on relocation? Yes. Under CAT. Yeah. Under CAT, it is our burden. And we concede that we did misstate the law on that. It is the government's burden under withholding. It's our burden under CAT. So did he offer any evidence that he could not relocate to Sao Paulo, to Recife, to Brasilia, to, you know, this is a huge country. Well, Your Honor, if I might ---- Is the answer to my question no? No. The answer to your question is yes. He did offer substantial evidence. The ---- you see, the fact of the matter is that the drug lords in Brazil are the fourth power of the country after the legislative, judicial, and executive branches. That's not in dispute. I don't think there's any dispute about that. Their influence is pervasive inside the jails, outside, in small towns, in large towns. There are networks that run rampant through the entire country, not only up to the borders of the country, but beyond the borders, for example, in Bolivia, into Bolivia and other states in South America. It is especially true where the drug lords are involved with corrupt ---- in cahoots, so to speak, with the drug ---- with the police and the information services within the country of Brazil. He is not safe anywhere within the country. He ---- this influence, the ---- Mr. Ferreria analogized the situation in Brazil to that of the Italian mafia. He said there's no difference in ---- between the Italian mafia and the drug cartels, the drug lords in Brazil. I would ask you this. Hypothetically, Your Honors, if I were to say to you that a certain individual who was giving up ---- who refused to cooperate with the Italian mafia on a high level or was responsible for putting into jail, imprisoning, one of the highest ranking members of the Italian mafia, would that ---- given this Italy, would that be considered in, say, Rome, and he decided that, well, I'll move to Milan, and, you know, hopefully I'll be safe there because the influence doesn't extend to that? Roberts. That would be fact specific to the case, but the question both of my colleagues have asked you, and you seem to be struggling with a bit, you understand we don't confer on the merits before we take the bench? I do understand. Unlike other courts, you now have all three of us asking the same question. The I.J. noted that when he went back to Brazil, he lived in a rural area, and until he went to the nightclub in the very city where this drug lord operates principally, he had no problems. We know at the time that the attack occurred, the last one, where he was hospitalized for a month, that Oliveira stated there are witnesses. It's not in dispute. I mean, after all, Mercedo's testimony was found credible by the judge. Oliveira told Mercedo, as his honchos were stabbing him with stilettos and nearly killed him, that he, as he left, I'm going to kill you. I think that when you combine the ---- Did he say, I can find you anywhere? Well, I don't think that he ---- I think he certainly can apply that is the case, because this ---- the influence and the power and the scope of Mr. Oliveira's influence in Brazil runs through the entire country. It's not located. If you look at the various exhibits that I have attached here, there are Department of State outlines, there are country condition reports, there are letters from the chief of declarations from the chief of police who says, this ---- you're not safe in this country. You have to leave. But let me get back to this one point before I can. Our main point here on this deferred cat is that the judge applied the wrong legal standard in enunciating that Macedo didn't ---- in misapplying, misdefining acquiescence, the judge said, we need a willful duty, we need willful conduct, acceptance, and in a breach. And in Zhang, and in Ochoa, in Ornales, Chavez, this Court has ruled that that is not what's required. All that is required is a willful blindness. And that's exactly what happened here. The immigration judge specifically asked, in a sense, the Court to tell him that he's wrong. Roberts. Thank you, Counsel. Your time has expired. We'll hear from the government. May it please the Court, I am Edward Wiggers and I represent the Respondent in this case. The immigration judge properly concluded that the evidence did not establish petitioner's eligibility for withholding removal and protection under the conditions of torture. Petitioner failed to carry his burden on withholding of removal because he did not tie ---- Mr. Wiggers, would you mind coming a little closer to the microphone? Thank you. My apologies, Your Honor. The immigration judge concluded he did not establish his eligibility to withholding because he failed to tie the events in Brazil to an enumerated ground, and that he was not ---- did not establish his eligibility for cap protection based on an absence of government acquiescence and the fact that petitioner could relocate within the country. Now, with respect to the cap claim, how does the government read Ornelas-Chavez at this point, as it applies to this case? I'm sorry, Your Honor, if you could refresh my recollection. Ornelas-Chavez v. Gonzales, it's enough that public officials could have inferred the alleged torture was taking place, remained willfully blind to it, or simply stood by because of their unwillingness or inability to oppose it. Thank you, Your Honor. The government of Brazil did not willful ---- show willful blindness in this case. While the chief of police did say to Petitioner that they did not have the resources to provide him protection, essentially affirmative protection, a security detail, the police did intervene when Petitioner was, in fact, attacked by the drug dealer. And stopped the fight. So it's not a question of the government being unable to discharge its duties of forestalling criminal acts, especially once the commission of the crime has begun. Did they offer him protection after that attack? No, Your Honor. I do not believe they did. Why couldn't that be deemed acquiescence? It wasn't ---- Is it conceivable in this country that if a local police officer participated in the arrest of a major drug lord and was later attacked by that drug lord and hospitalized, that any law enforcement agency anywhere in the United States would not offer him protection until the threat dissipated? With the United States hypothetical, Your Honor, I don't know if it's a direct corollary with the situation in Brazil. The indication given to Petitioner was that they lacked the resources to afford him a protective detail. But as far as whether that constitutes a situation that rises to the level of willful blindness, I believe it would depend upon the natures of the unwillingness as far as the allocation of resources for purposes of satisfying that question. The State Department reports reveal that witnesses in a criminal case, specifically a murder that involved two mayors as suspects in the commission of the crime, did receive protection. So it appears that Petitioner's situation arose in the question of Brazil's  So if this threat involved the chief of police, they would probably have the resources? No, Your Honor. If it involved the mayor, they'd probably have the resources? No, Your Honor. Not for a line officer? Your Honor, I may have been unclear. The mayors were the suspected murderers, and the witnesses against them were the ones who received the protection. Do you have any doubt that if these threats had involved this individual's chief of police, that there would have been protection? I don't have – I don't believe the record is sufficient to answer that question, Your Honor. However, that's not the question that was presented to the agency. Isn't one of the problems here is that they were trying to develop a record that basically showed that there was, you know, corruption within the police department and that some of these so-called lack of resources were a result of the whole structural situation, and the police department and the I.J. said, no, no, no, you can't even go there. So isn't one of the problems is they weren't even permitted to develop the kind of record you would need to address this precise issue? No, Your Honor. The State Department reports reveal that while there were localized incidents where crime and corruption was a significant problem in local governments, such as I believe the situation in Sao Paulo where there was a problem with corruption in one of the other cities, it did not – the State Department reports do not indicate that it is a generalized or pervasive problem, especially to the extent that Petitioner presents, and the record does not compel a contrary conclusion to the immigration judge's finding. It's not that the – That didn't answer my question. I didn't ask about the State Department. I asked about evidence that the Petitioner was trying to get in about the local situation, which he wasn't permitted to get in because the IJ said, well, that's not relevant to CAT. And it seems to me you're saying, well, there's a State Department evidence that rebuts this issue. If that issue – if that evidence is relevant, why wouldn't the Petitioner's own explication be relevant on this point? Well, Your Honor, Petitioner did testify that there were several honest police officers also in his police department. And based on his – based on that representation, it does not appear that corruption was sufficiently pervasive to where it would inhibit the government's ability to protect him. You know, that's a wonderful, prepared statement. It is absolutely unresponsive to the question you were just asked. My apologies, Your Honor. The question is the relevance under CAT where the IJ cut the Petitioner's questioning off, saying this doesn't have any relevance to CAT. So why – why doesn't – if the issue is whether then they're unable to provide protection, why isn't it relevant as to what is the situation in that locale? It falls under, Your Honor, the immigration judge's conclusion that Petitioner could relocate and, in fact, did so safely for four years in Brazil before returning to the area where he encountered the drug dealer in the first place. Petitioner – whether there is a local corruption problem in the area where Petitioner was targeted ceases to be relevant when it – when it becomes apparent that Petitioner could relocate away from that area and remain safe for purposes of analysis under CAT. That was the essence of the immigration judge's finding on the CAT question. Apart from the fact that the government did not acquiesce, Petitioner did not establish that he could not relocate and remain safe. Again, the question is, why is the government's evidence on this point relevant and the Petitioner's not? Petitioner's evidence goes to the specific locale and does not address the concern of his ability to relocate, Your Honor. The government's evidence bears on the more general conditions that would answer the question of his ability to relocate and supports Petitioner's own testimony that he was – that he was safe when he stayed outside the area where he had encountered the drug dealer originally. And as far as – the record does not compel a contrary conclusion, especially in light of Petitioner's admissions regarding his safety in Brazil prior to the incident in the nightclub. And regarding Petitioner's withholding claim, the immigration judge found that he did not tie it to a protected ground and the record does not compel a contrary result. Petitioner's testimony and his declaration in the record revealed that the drug dealer's motivation was because of the death of the drug dealer's wife while coming to visit him after Petitioner arrested him and in the subsequent death of one of his colleagues. It is evident from the record that the drug dealer's motivation in that regard was personal in nature, and a private vendetta without any attachment to a government – without any attachment to the government does not rise to the level of persecution and is certainly not tied to an enumerated ground. On the issue of ability to relocate, Petitioner did offer evidence, including affidavits, about the general level of corruption countrywide and the influence of drug lords, did he not? Yes, Your Honor, he did. Did the government rebut that evidence in any way? The – Did it present any contrary evidence? The State Department reports, Your Honor. Other than that? I do not recall any other contrary evidence from the record. However, to an extent, Petitioner's own testimony does contradict the assertions in the documents he submitted based on his apparent safety. Subject to any further questions from the Court, that concludes the government. No further questions. Thank you, counsel. The case just argued will be submitted for decision. And we –
judges: O'scannlain, Hawkins, McKeown